RECEIVED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK

DATE ___10, 15 , 08___
BY ___Bm___

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

ROY LEE HUGHES, II

versus

WARDEN, ET AL.

CIVIL ACTION NO. 03-0792-P

JUDGE STAGG

MAGISTRATE JUDGE HORNSBY

## MEMORANDUM RULING

### Introduction

A Caddo Parish jury convicted Roy Lee Hughes ("Petitioner") and co-defendant Reginald Williams of armed robbery and second degree kidnapping. Petitioner was also adjudicated an habitual offender (fourth felony) and was sentenced to life imprisonment. Petitioner pursued several issues on direct appeal and through the state post-conviction remedy process. He then filed a federal petition for habeas corpus relief that asserted all of the issues exhausted in state court.

The court previously dismissed all claims in the petition except Petitioner's claim of ineffective assistance of trial counsel based on failure to interview and call alibi witnesses. The court appointed attorney Douglas L. Harville to represent Petitioner with respect to that remaining claim. After a status conference and an opportunity for discovery, an evidentiary hearing was held on August 25, 2008. After

considering the evidence and the arguments of counsel, and for the reasons that follow, the final claim presented in the habeas petition is denied.

**Background Facts**

A review of the evidence presented at trial is necessary to lend context to the ineffective-assistance/alibi issue. Loreco Douglas, the victim, testified at trial that he was driving his 1977 Oldsmobile Cutlas through the Cedar Grove neighborhood of Shreveport when a man flagged him down. Mr. Douglas did not know the man's name, but he testified that he had "seen him around." The man, whom Mr. Douglas later identified as Petitioner, said that he knew Mr. Douglas and mentioned the names of some alleged mutual schoolmates.

Petitioner, whom Mr. Douglas also identified in the courtroom, asked for a ride to a residence on Pine Tree, and the two men drove to a home on that street. Another man arrived at the residence. Mr. Douglas testified, with respect to the second man, that he had "seen him around before," and he identified the man as Reginald Williams, Petitioner's co-defendant. The three men went inside the house. Petitioner was talking to Mr. Douglas when Petitioner and Williams said something about a "19-jack," which Mr. Douglas did not understand, but the words were followed by Williams and Petitioner drawing pistols.

Petitioner and Williams took Mr. Douglas's tennis shoes, jacket, pager, and cash. The men tied Mr. Douglas with shoestrings and clothes hangers, and they pulled a stocking cap over his face. They placed Mr. Douglas in the trunk of his car and drove around for what Mr. Douglas guessed was 35 to 40 minutes. Mr. Douglas was able to untie himself during that time, and he found a crescent wrench that he used to open the trunk.

Mr. Douglas jumped out of the car. His fall to the street tore his clothes and caused scrapes to his elbows, knees and feet. Some men in a U-Haul truck saw Mr. Douglas jump from the car, and they took him to the nearby Mall St. Vincent, where Mr. Douglas found a security officer who called the police. Tr. 767-75.

Officer P. D. Vines responded to the Saturday afternoon call and spoke with Mr. Douglas. Officer Vines observed that Mr. Douglas was bleeding from the elbows and knees, his pants and shirt were torn, and he was not wearing shoes. The fire department rendered first aid at the scene. Mr. Douglas was "in shock" and was not able to give Vines much of a description at the scene. Mr. Douglas did not give Vines any names of suspects, and he gave only a brief description of one of the two suspects, a description of the guns used, and a description of the items that were taken. Tr. 760-66.

The case was assigned to Detective Tom Oster, who spoke with Mr. Douglas on the Saturday of the crime and met with him face-to-face the following Monday. Mr. Douglas gave Detective Oster descriptions of the suspects and told him that the man who asked for a ride (Petitioner) had used the nickname "Rollo." The victim described Rollo as a black male, early twenties, tall, thin, dark skinned, with a low hair cut. The other man was described as younger, around 18, lighter skinned, shorter, and with a long, curled hairstyle.

Detective Oster, based on the physical descriptions provided and his knowledge and experience gained from working that part of town, put together a photo lineup. Mr. Douglas viewed the six-photo lineup and positively identified Reginald Williams as one of the robbers. Tr. 840-50.

Detective Oster then checked alias files and asked several officers around town in an effort to find a Rollo. Mr. Douglas asked around his neighborhood about persons using the name Rollo, and he soon called Detective Oster and told him Rollo's "real name." Detective Oster put together a photographic lineup that included a picture of Petitioner, and Mr. Douglas made a positive identification of Petitioner. Tr. 850-54. Police later recovered Mr. Douglas's car from a convenience store. No usable fingerprints were found, and there was no evidence such as shoestrings or hanger wire in the trunk. Tr. 855-56.

Detective Oster testified that Reginald Williams was arrested about two weeks later, and Oster interviewed him. Oster asked Williams what he was doing on January 11, 1997, and Williams said that he was at his house with his sister and his mother until 2:00 in the afternoon. Williams, in describing his whereabouts, used the date January 11, 1997 five or six times. Detective Oster asked Williams what day of the week that was, and Williams said that he did not know. Williams told Detective Oster that he left his house that afternoon with Derrick Whittaker, who drove Williams to a girlfriend's house, where Williams spent the night. Tr. 858-62. (Petitioner was arrested about four months later in Dallas, Texas. Detective Oster attempted to interview him, but Petitioner chose not to make a statement). After presenting the above evidence, the State rested its case against Williams and Petitioner. Williams called a single alibi witness, his sister, Dorothy White. She testified that she saw Williams in the backyard of their house around 2:00 in the afternoon on January 11, 1997. Ms. White, who worked a late shift at a local casino, said that she woke up that afternoon at about 1:20 p.m. Soon afterwards, she saw Reginald in the backyard playing with a dog. Tr. 897-901.

Petitioner also called a single alibi witness, his brother, Derrick Whitaker. Mr. Whitaker testified that Petitioner had been living in Dallas since early December 1996, a few weeks before the alleged crimes at issue. Mr. Whitaker admitted on

cross-examination that he had a conviction for distribution of illegal drugs. Tr. 906-14.

The jury found Williams and Petitioner guilty of both armed robbery and second degree kidnapping. Tr. 954. Each man was adjudicated an habitual offender, with Petitioner being a fourth-felony offender. Petitioner was sentenced to life imprisonment for the armed robbery, plus 30 years (concurrently) on the second degree kidnapping.

**State Post-Conviction Proceedings**

Petitioner argued in his post-conviction application that counsel was ineffective because he allegedly failed to interview two potential alibi witnesses. Petitioner's counsel did file a notice of intent to offer an alibi defense. The notice listed one witness, Timothy Stewart of Dallas, Texas. Tr. 93. Mr. Stewart did not testify at trial. Counsel did call Derrick Whitaker as an alibi witness. Tr. 906.

Petitioner argued in his post-conviction application that counsel was ineffective because he failed to interview and call as alibi witnesses Timothy Stewart and Marcus Crosby, "who would have testified Roy L. Hughes was not present at the alleged scene of the crime." Tr. 1321, 1324. The state's memorandum in response (Tr. 1342) addressed other Strickland claims but omitted any discussion of this issue. Tr. 1347. Petitioner pointed out in his traverse that the state did not address the issue, and he

added (1) that the alibi witnesses would testify that Petitioner was in Dallas at the relevant time and (2) a contention that Petitioner "stated to all of his counsels that he had alibi witnesses, who lived in Dallas, Texas," but counsel did not make an adequate effort to interview or locate the witnesses even though Petitioner had provided "proper addresses and telephone numbers" for both witnesses. Tr. 1358.

The trial court judge, without conducting a hearing or receiving any evidence, issued a written decision that, with respect to this issue, stated only that, "Counsel's failure to interview petitioner's alleged alibi witnesses does not satisfy the two-prong test of Strickland." Tr. 1369-70. The appellate court denied a writ application, stating only that the trial court "correctly found that the claims raised in the trial court" were "without merit." Tr. 1423. The Supreme Court of Louisiana denied writs without comment. Tr. 1473.

**The Evidentiary Hearing**

### A.    The Need for a Hearing

Petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel. Counsel's performance was deficient only if he made errors so serious that, when reviewed under an objective standard of reasonable professional assistance and afforded a presumption of competency, he was not functioning as the "counsel" guaranteed by the Sixth

Amendment. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). Prejudice exists only if there is a reasonable probability that, but for the error, the result of the trial would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. Id. 104 S.Ct. at 2068.

The Fifth Circuit has held that it is unreasonable for counsel not to try to contact known alibi witnesses and ascertain whether their testimony would aid the defense. Bryant v. Scott, 28 F.3d 1411 (5th Cir. 1994). Resolution of such a claim requires factual inquiry into what the attorney knew and when, the reasonableness of his investigation, and other factors. The Fifth Circuit has stated that a federal hearing for further development of the record may be in order when the state courts have denied an evidentiary hearing and not permitted adequate development of the facts to permit resolution of the claim. Harrison v. Quarterman, 496 F.3d 419 (5th Cir. 2007) (vacating denial of habeas petition and ordering development of record in failure-to-interview witness case); Bryant, 28 F.3d at 1419-20 (same). The facts in the state court record did not permit resolution of the Strickland claim based on failure to interview and call alibi witnesses, so the court appointed counsel for Petitioner and held an evidentiary hearing.

## B.     Attorney Rickey Swift

Attorney Rickey Swift testified at the hearing that he was employed at the Caddo Parish Public Defender's Office at the relevant time and was assigned the defense of Petitioner. Another public defender, Michelle Andrepont, had been assigned to the case earlier, and Mr. Swift inherited her notes. See Exhibit S-1. Ms. Andrepont completed a form that requested an investigation regarding potential alibi witnesses. She wrote a name, address, and telephone number for each of three witnesses: (1) Timothy Stewart; (2) Brian Knight; and (3) Marcus Crosby.

Ms. Andrepont made a brief note about each witness. Her note, as explained by Mr. Swift in his testimony, was based on what Petitioner told her about each witness. She wrote that Timothy Stewart was the manager of Stewart's Body Shop and that Petitioner "worked there 12/96-3/97." (The robbery and kidnapping of Loreco Douglas happened on January 11, 1997.) Ms. Andrepont noted that Mr. Knight was the manager of Aladdin Car Wash and that Petitioner "worked there 02/24/97-05/15/97." With respect to Marcus Crosby, Ms. Andrepont wrote only "worked w/[Petitioner]."

Ms. Andrepont wrote on the request for investigation that Petitioner "says he was in Dallas" on the January 11, 1997 date of the crime. She asked that the investigator please check with the alibi witnesses for verification. Mr. Swift testified

that the investigators may have written letters or made other efforts to communicate with the alibi witnesses, but those matters would not have been in his public defender file. If the investigator had prepared a report regarding a witness, that report would be in his file, but he had none. Thus, the record does not show what, if anything, the investigator did.

Mr. Swift testified that he personally made efforts to contact the alibi witnesses. He called the Aladdin Car Wash, where he learned that the manager listed in Ms. Andrepont's notes was no longer employed there. Mr. Swift did speak with Greg Gabbert, the owner of the car wash, and Mr. Gabbert told him that Petitioner had never worked at the car wash, but he had hung around there some with Mr. Gabbert's son, whom Mr. Swift said he seemed to recall was Marcus Crosby (one of the three listed alibi witnesses). Mr. Swift noted that the dates on which Petitioner alleged that he worked at the car wash were well after the crime, so any testimony about working or hanging around the car wash did not provide an alibi defense. Mr. Swift recalled that it was his belief at the time that Marcus Crosby was related only to the post-crime car wash time frame, so Mr. Swift did not write any letters or make more specific attempts to contact Mr. Crosby. Swift testified that he did not have any information from his client that Petitioner was with Marcus Crosby in Dallas at the time of the Shreveport crime.

Mr. Swift did take additional steps to talk to Timothy Stewart, who allegedly could vouch for Petitioner's employment in a Dallas body shop for an approximately four-month period that included the date of the crime. Mr. Swift testified that he made several calls to two phone numbers. He stated that his notes suggest that he talked to someone at the body shop, but he never made contact with Stewart himself. Mr. Swift's distinct handwriting on the form begun by Ms. Andrepont also evidences his efforts to call the various witnesses.

About three weeks before the trial, Mr. Swift sent a letter by certified mail to Mr. Stewart. He addressed it to the body shop address provided by Petitioner. Swift wrote that Petitioner "has informed me that he was with you most of the day of January 11, 1997 working at your father's body shop." Mr. Swift added that if the information were true, Stewart would be needed to testify at the June 15, 1998 trial. Mr. Swift also noted, "I have called your home several times leaving a message [but] have not received any response from you." He asked that Mr. Stewart respond promptly to the letter (which included Mr. Swift's address, telephone number and fax number), and stated that if Mr. Stewart did not contact him a subpoena might issue for the trial.

Mr. Swift testified that, in addition to his telephone calls and the letter, Petitioner's brother, Derrick Whittaker, was making efforts to contact the alibi

witnesses and have them get in touch with Mr. Swift. Mr. Swift said that Mr. Whittaker allegedly knew the people, but he was not able to get them to call Mr. Swift.

Mr. Swift testified that, on the Friday before the scheduled trial, he and counsel for the co-defendant met with their clients at the jail to discuss outstanding plea bargain offers and related issues. Mr. Swift clearly recalled that Petitioner was adamant that he wished to reject the plea offer and proceed to trial, even though he knew Mr. Stewart had not been contacted. Petitioner expressed his strong belief that the state would not be able to convict him because of the lack of physical evidence and the identification by a victim who did not know Petitioner beforehand. Mr. Swift testified that Petitioner never suggested that he wanted to delay the trial in an effort to secure the presence of any additional alibi witnesses, and Mr. Swift said that he would have filed a motion for a continuance had Petitioner made such a request. Petitioner knew that his brother would testify as an alibi witness instead of Timothy Stewart, and he made no request that the trial be delayed.

### C.    Timothy Stewart

Counsel in this federal proceeding traveled to Dallas and took the deposition of Timothy Stewart on July 30, 2008. Although Mr. Stewart testified that he would do his best to attend the evidentiary hearing in Shreveport on August 25, and counsel

for Petitioner purchased a bus ticket for Mr. Stewart, Mr. Stewart did not appear at the hearing or contact the court or counsel to explain his absence. Petitioner's counsel obtained information that the ticket was never picked up from the Dallas bus station. Both counsel agreed to submit Mr. Stewart's deposition as Exhibit D-1 in light of his unavailability.

Mr. Stewart testified at his deposition that he has known Petitioner since elementary school and remained friends with him, talking almost daily, through high school. Mr. Stewart moved to Dallas, but he says the two wrote letters for a while. Stewart said that Petitioner, who had also lived in Dallas at one time, called him in late November or early December of 1996 "out of the blue" and told him that he was back in town (Dallas). Stewart said that he was certain that the year was 1996, and he remembered that it was winter because a young female companion with Petitioner needed a jacket from him.

Stewart testified that he picked up Petitioner and his female companion from some apartments in north Dallas and brought them to his house. Petitioner soon began working at Stewart's Body Shop, owned by Mr. Stewart's father. Mr. Stewart was certain that the work began "way before Christmas" because Petitioner was in need of money (for the holiday). Petitioner was never formally employed at the shop. Rather, Mr. Stewart would personally pay Petitioner "off the books" with cash from

his pocket for Petitioner's help on various projects. He recalled that Petitioner began working at a car wash around the end of February or the first of March.

Mr. Stewart was asked if he knew where Petitioner was on January 11, 1997. Stewart testified that the date was three days before his birthday and to "the best of my knowledge, he was here in Dallas." He said he recalled the birthday because he and Petitioner did a lot of drinking and, although Mr. Stewart did not smoke marijuana, he was influenced at that time to take a puff, which was his last one. Stewart had no specific recollection of where Petitioner was on January 11, but he thought that Petitioner would have been in Dallas because he worked for Stewart at the body shop "pretty much every day," and the shop was open seven days a week. (January 11, 1997 was a Saturday.) Mr. Stewart said that Petitioner would ride the bus to the shop and arrive between 6:00 a.m. and 7:00 a.m. On most evenings, Mr. Stewart would drive Petitioner home.

Mr. Stewart testified that he knew Petitioner's brother, Derrick Whittaker, but not very well. He did not keep in touch with Whittaker after he moved to Dallas and had not heard from him until recently (in connection with these habeas proceedings). Mr. Stewart testified that Whittaker had called him, on the same day he spoke with current counsel for Petitioner, and told him that an attorney would be calling him. Mr. Stewart denied that Mr. Whittaker threatened him, told him what to say, or

otherwise influenced his testimony. Mr. Stewart said that the last time he remembered talking to Mr. Whittaker before that phone call was in the early 1980s.

Mr. Stewart said that, back in 1997, his girlfriend told him that Petitioner had been arrested. Stewart did not recall calling or talking to Petitioner at the jail or since. He also said that no one in Petitioner's family ever contacted him to tell him why Petitioner had been arrested. Stewart did recall that his girlfriend received a phone call related to the arrest, and it upset her so much that she never told him what was said.

Mr. Stewart testified that he was not aware of Petitioner traveling back to Shreveport between their first Dallas contact in November 1996 and when Stewart learned that Petitioner was in jail. He said that he figured Petitioner would have told him about any such trip or even asked him to go with him. Furthermore, Petitioner did not have a car. Mr. Stewart said that he did not know a Marcus Crosby.

Mr. Stewart was asked to review the letter that Mr. Swift sent to him by certified mail. He identified the address as that for Stewart's Body Shop. He said he may not have been working at the body shop at that time but, even so, he would have gone by frequently. Stewart looked at the signature on the return mail receipt and guessed that it was signed for by John Black, who operated a business in the same building as the body shop. Stewart said that he had never seen the letter before the

deposition. He said that had he received the letter he "may have called to find out what it was all about." He did not recall receiving any messages from a Mr. Swift during that time. He did recognize one of the telephone numbers, written in Mr. Swift's hand in the notes, as his brother's telephone number. Stewart said he never received a message from his brother that he received a call from Mr. Swift, but Stewart opined that his brother's wife at the time would not have given him any messages. Mr. Stewart was asked if there was any reason that he could specifically remember January 11, 1997 as a day that Petitioner worked with him. Stewart answered, "No ma'am, I can't remember anything special that date to make it stand out."

## Standard of Review

Federal habeas relief may not be granted unless the state court proceeding resulted in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). A merely incorrect state court decision is not sufficient to constitute an unreasonable application of federal law; rather, the decision must be objectively unreasonable. Virgil v. Dretke, 446 F.3d 598, 604 (5th Cir. 2006); Morrow v. Dretke, 367 F.3d 309, 313-14 (5th Cir. 2004).

The state court did not conduct an evidentiary hearing or make specific factual findings regarding this claim. Rather, it summarily dismissed the claim based without a hearing. This court conducted an evidentiary hearing and received all evidence the parties wished to submit. The Fifth Circuit has held that in such circumstances the federal court must nonetheless defer to the state court's decision pursuant to Section 2254(d). <u>Valdez v. Cockrell</u>, 274 F.3d 941 (5th Cir. 2001). The federal hearing "may assist the district court in ascertaining whether the state court reached an unreasonable determination" under Section 2254(d). <u>Id</u>. at 952.[1]

**Analysis**

The record shows that Ms. Andrepont, the original counsel, requested an investigation of the three witnesses provided by Petitioner. There is no evidence as to what, if anything, an investigator may have done. Mr. Swift testified, and his notes indicate, that he personally attempted to contact the three witnesses. He did not speak with any of the three, but he did speak with a reliable substitute for the car wash manager. The owner of the car wash told Mr. Swift that Petitioner had never been

---

[1] <u>Valdez</u> is the controlling precedent in this circuit, but it is not uniformly embraced, as evidenced by the panel dissent, the dissents for denial of en banc review at 288 F.3d 702 (5th Cir. 2002), and the contrary decisions issued by some other circuits. <u>See</u> Brian R. Means, <u>Federal Habeas Manual</u> § 3:28, <u>Effect of Receipt of New Evidence in the Federal Proceeding</u> (collecting cases on the circuit split).

employed at the car wash, but Petitioner had hung around the car wash some with the owner's son. As Mr. Swift noted, the dates that Petitioner allegedly worked at or hung around the car wash were well after the date of the crime (a fact also supported by Mr. Stewart's testimony), so there is no basis to conclude that the manager or other persons associated with the car wash could have provided a worthy alibi.

Mr. Swift's efforts to call the number provided for Marcus Crosby led to the discovery that the number was for a fax machine. Mr. Swift said that he did not attempt to fax a letter to that number or mail one to the address he had. But Swift said that he learned through his investigation that Crosby's value as an alibi witness was related only to his work with Petitioner at the car wash. Ms. Andrepont's notes about Crosby state only that he worked with Petitioner. Mr. Swift was asked by Petitioner's counsel if he knew whether Crosby and Petitioner might have been friends and associated outside of work at the car wash. Mr. Swift stated that he had no such knowledge, and there has been none placed in the record.

Petitioner faults Mr. Swift for accepting the word of the car wash owner without objective proof that the person was really the owner, and he urges that Swift should have sent a letter or made other efforts to contact Marcus Crosby. The Court finds, however, that Mr. Swift's efforts were objectively reasonable under the circumstances. He spoke with a person who was in a position to verify whether

Marcus Crosby could serve as a sound alibi witness. Swift confirmed, through the car wash owner, that Crosby could not provide a good alibi because of the dates of Petitioner's alleged employment at the car wash, and Swift had no information to suggest that Crosby could offer an alibi on any other basis.

The Fifth Circuit observed in Bryant, 28 F.3d at 1419 n. 13 that the performance prong of Strickland does not always require an actual interview of every claimed alibi witness. The Court recognized that counsel does not have unlimited time and that his judgment in the effective use of time is generally entitled to deference. For example, the Court stated, the need to actually interview a witness may depend on the results of interviewing other witnesses or other investigation that may indicate that further pursuit of the witness would likely be a waste of time.

This is not a case, like Bryant, where counsel did no pre-trial investigation whatsoever. Rather, Mr. Swift conducted an adequate investigation to determine, in his opinion, that Marcus Crosby was not an alibi witness that he needed to pursue further. Thus, the state court's adjudication of the Strickland performance prong was not objectively unreasonable with respect to the claim that Mr. Swift did not interview or adequately investigate Marcus Crosby. Furthermore, despite the opportunity presented by the federal evidentiary hearing, there has never been any evidence that Crosby could and would have offered alibi testimony that would give

rise to a reasonable probability that, but for the presentation of that evidence, the result of the trial would have been different. The lack of such evidence supports a determination that the state court's adjudication of the prejudice prong of Strickland with respect to the Marcus Crosby claim was also not objectively unreasonable.

As for Timothy Stewart, Mr. Swift made several telephone calls and sent a letter in an effort to contact Stewart. His efforts were unsuccessful. Petitioner knew that Mr. Stewart would not be available for trial, but he nonetheless rejected a plea offer and did not express concern about proceeding to trial without making further efforts to secure the presence of Mr. Stewart as a witness. Stewart did offer testimony at his deposition that would have lent some support to the alibi defense. The testimony had weaknesses that could have been probed by the prosecution, but it was certainly worthy of presentation.

Once again, this is not a case such as Bryant v. Scott in which defense counsel completely abdicated his responsibility to investigate potential alibi witnesses. Mr. Swift offered credible testimony, supported by his letter, that he made several phone calls to two phone numbers and sent a letter by certified mail (noting therein his several unsuccessful phone calls) and asked Mr. Stewart to respond promptly. Mr. Swift did not take the additional step of issuing a subpoena for an out-of-state witness, as permitted by a procedure in La. C.Cr.P. art. 741. He did not offer an

explanation for not taking that step, although the certified mail letter stated that a subpoena might issue if Mr. Stewart did not contact Mr. Swift. We now know, from Mr. Stewart's testimony, that Mr. Stewart claims to have never received the letter and that he may not have been working at the body shop at that time. This gives rise to significant doubt as to whether a subpoena could have been successfully served on Mr. Stewart, as the one address counsel had for him was apparently incorrect at that time.

Counsel arguably could have done more to investigate Mr. Stewart, but whether more could be done is not the relevant standard. The question is whether Mr. Swift conducted a reasonable investigation that fell within the objective standard of reasonableness set forth in Strickland. The court must make an objective review of the performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time. Smith v. Quarterman, 471 F.3d 565, 569-70 (5th Cir. 2006). The reviewing court should make every effort "to eliminate the distorting effects of hindsight" when evaluating counsel's efforts. Strickland, 104 S.Ct. at 2065.There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id; Smith, 471 F.3d at 570.

Mr. Swift, as noted, could have issued a subpoena or perhaps made other efforts to investigate Mr. Stewart's worthiness as an alibi witness. But, under the entire circumstances, Mr. Swift's efforts were adequate to fall within the wide range of professional competence. He made several telephone calls and sent a letter without success. He was told that his client's brother, who knew Mr. Stewart, also made efforts to contact Stewart. His client, knowing that the alibi witness would not be present to testify, stated a readiness to reject a plea offer and proceed to trial against what he believed was weak evidence. In that setting, and without the distorting effects of hindsight, counsel was not deficient for not requesting a continuance to make additional efforts to communicate with or subpoena Mr. Stewart. More important to this habeas analysis, the state court determined that counsel was not ineffective, and the facts developed at the federal hearing do not show that the state court's determination was an objectively unreasonable application of Strickland.

If either component of an ineffective assistance claim, performance or prejudice, is not established, the court need not address the other. Strickland, 104 S.Ct. at 2069. Petitioner's claim with respect to the investigation of Mr. Stewart fails to satisfy the performance element of Strickland, so there is no need to address prejudice. For these reasons, the petition for writ of habeas corpus is denied, and a judgment will be entered accordingly.

THUS DONE AND SIGNED at Shreveport, Louisiana, this ___10th___ _ day of ___October___, 2008.

_____
TOM STAGG
UNITED STATES DISTRICT JUDGE